In the fall of 1936 or 37, after a football game at L.S.U., Willie Sims, a negro employed at the University, found a diamond ring mounted in platinum with other precious stones, at about Gate No. 4, on the southwestern end of the stadium. Sims brought the ring to his wife, who began to wear it in such a manner that it was clearly visible to anyone. In the early part of 1940, Wilbert Jackson, a negro employee of Ben Roumain, a jeweler in the City of Baton Rouge, saw the ring on the finger of Sims' wife; and being friendly with the Sims, he suggested to them that the ring may be valuable and that they should have it tested by a reputable jeweler. Jackson had some seven years' experience as an employee of Roumain and necessarily must have acquired some knowledge of the values of gems. There is nothing to intimate that the Sims had any such knowledge; in fact, they seem to have felt that the ring was merely an ornament of no great value.
Wilbert Jackson reported the incident of having seen this ring on Sims' wife's finger to Roumain, his employer, and to his co-employees, of which plaintiff Griffing was one; Collins, a fellow employee, told him to experiment with the stone and see if it would cut glass; that, if it did so, the stone was most probably a diamond. The very next opportunity Jackson had to see the Sims, he persuaded them, without disclosing any information or purpose, to allow him to make this experiment, and which resulted in the stone cutting into glass. Sims, upon Jackson's insistance, agreed that he would visit Roumain's Jewelry Store to have the ring examined, and, as they say in the testimony, "tested".
Accordingly, on the following Monday morning, in February, 1940, Sims took the ring to Roumain's Jewelry Store, where he met Jackson in the front. Jackson took Sims into the store and had Sims hand the ring to Collins. Roumain, the proprietor, was then absent, but Griffing, plaintiff and co-employee of both Collins and Jackson, were present. Collins had Jackson to wash the ring; while the washing of the ring, according to the evidence, was not as complete a washing as required for an examination of a stone, yet it appears to have been sufficient for Collins to make some inspection of the same; after which inspection, he informed Sims that it was a diamond ring but the stone appeared to have bubbles in it, nothing being inquired about or said as to its value.
Roumain, who in the meantime, had returned to his establishment, inquired as to what was being done, and was informed that the ring was being examined. Roumain, after looking at the ring, was informed by Collins that it had bubbles, and joined in the discussion. There is some conflict in the testimony as to what was said regarding its value but, nevertheless, Roumain left his store with the ring and was absent therefrom for some fifteen minutes.
Whilst this latter discussion about the ring and its value was being had between Roumain, Collins and Sims, the plaintiff was within a distance of four to fourteen feet, sitting in his compartment near the *Page 447 
front of the store, and had some knowledge of what was going on and of an offer to buy or sell the ring for $130.
In a few minutes Roumain returned with the ring but he failed to buy it; Sims then started to leave the store but before walking out he and Griffing engaged in some conversation relative to the sale and purchase of the ring, the details of which are disputed, but as a result of which Griffing agreed to buy the ring for $130.
Under this agreement, Sims was to meet Griffing during the lunch hour, after twelve o'clock, in front of the Louisiana National Bank building, where the deal was to be finally consummated. Griffing, joined by his wife, met Sims as planned. Griffing attempted to borrow the money from the First National Bank but was unsuccessful. His wife then went to the City National Bank, within the same block, where she was able to negotiate a loan to complete the deal with Sims. Sims was then paid $120 with the assurance that the balance would be paid within a few days, and he delivered the ring to the Griffings. A few days thereafter Sims called at the Griffing residence for the balance due him and was paid another dollar with the promise that on Saturday night he would be paid the remainder. On Saturday morning, two Police Officers of the City of Baton Rouge called at the Griffing residence and obtained the ring, as they were suspicious that the ring had been stolen and they desired to conduct an investigation. Mr. Atkins, the Chief of Police, took the ring in his possession and had it up to the trial of the case when he surrendered it to the custody of the Clerk of Court, where it is now to await the final termination of this suit.
The ring has a value of $1,250. In fact, Griffing himself, who knows the value of gems, says that it is worth at least $500.
On March 18, 1940, Griffing instituted this suit in the form of a possessory action against Wilbur B. Atkins, the Chief of Police of the City of Baton Rouge, setting out his purchase of the same and possession thereof from the day of his purchase to the time it was seized by the police officers of the city, and which seizure, he avers, was unlawful and consummated against his wishes and without his consent. He avers that he has suffered a real disturbance in fact and in law in his possession of the ring; that less than a year has elapsed since the said disturbance and that he desires to be restored to its possession.
Thereafter, Willie Sims intervened in the suit, claiming the ownership of the ring. He alleges that he is an ignorant colored man, without knowledge of gems and without ability to determine their quality or their value; that, by all that transpired, he was fraudulently led to believe that the ring had no value of more than $100; that the plaintiff and purchaser, Earl Griffing, who is very familiar with gems and jewelry and who has knowledge of the character, nature and value thereof, was fully aware, at the time of the purported sale, of the real value of the ring.
For the revocation of the sale, he charges fraud and deceit on the part of Griffing and error on his part.
He alleges that the false statements made to him and the suppression of the truth by Roumain, and by plaintiff's co-employees, to the knowledge of plaintiff, and by plaintiff himself, of the real character and value of the ring, fraudulently caused and induced him to sell the ring; that, therefore, the sale should be rescinded, annulled and set aside and that he should be restored to the possession of the ring.
He alleges that Griffing did pay him the sum of $121 as part payment of the price, which he accepted at the time, but that, on March 30, 1940, in the presence of competent witnesses, he tendered that amount in legal tender money of the United States to Griffing and demanded the return of his ring, which was refused. In his prayer, he asks for judgment rescinding and annulling the sale and that he be adjudged entitled to the possession of the ring.
The Chief of Police filed an answer in the suit in which he denied all the allegations of the petitions of both the plaintiff and intervenor but admitted having the ring in his possession. From the record, it now appears that he is no longer concerned as to the final outcome of the case in that he concedes that he was unable to support his claim that the ring had been stolen. He deposited the ring with the Clerk of the Court and submitted the matter to the Court for judgment.
Griffing answered the intervention of Sims and virtually denied all therein set out save the following pertinent admission that he, Griffing, was a jeweler, employed by Roumain, and as such was very familiar *Page 448 
with gems and jewelry, and upon examination of any particular gem or piece of jewelry, he could readily realize the character, nature and value thereof. He avers, however, that he purchased the ring at Sims' solicitation for the price of $130, having paid $120 in cash with the understanding that he was to pay the balance of the purchase price within a few days thereafter. He denies that intervenor's call at his residence was in accordance with the understanding for the payment of the balance of the purchase price, but admits that his wife, upon such visit of intervenor, paid to the intervenor the additional sum of $1. Griffing admits tender of the $121 and its refusal as alleged by intervenor. In further answer, Griffing avers that his reason for the non-payment of the balance of the purchase price was that the ring had been seized and taken from his possession by the Chief of Police for the City of Baton Rouge and before it was due as agreed.
From a judgment in favor of Griffing and decreeing him to be the legal owner of the ring, the intervenor, Willie Sims, has appealed.
In our preparation of a preliminary statement of the history, facts and issues of the case so developed by this record, we have covered all such facts as were not disputed leaving such disputed facts to be considered in our final consideration of the case.
In the decision of this case it must be remembered that Roumain had in his employment at the time Sims visited his place of business Jackson, Collins and the plaintiff Griffing; it must also be remembered that Sims visited this establishment on the advice and solicitation of Jackson, one of these co-employees. With this in mind, the controversial facts in the case are the probability and possibility of plaintiff Griffing not knowing or hearing any of the conversations which took place in this small establishment as a jewelry store, such as the examination by Collins, a co-employee, of this ring, Collins' report to Sims of the ring having "bubbles", Collins' report to Roumain of the same, and the conversation between Roumain and Sims as to the status and value of the ring and the offer to Roumain to buy this ring for the sum of $130.
When Sims arrived at Roumain's Jewelry Store, he was met on the outside of the store by Jackson and, upon informing Jackson that he had the ring with him, he was immediately escorted to the back of the store to Collins with the statement that he was "the boy I had been telling you about had the ring"; he handed the ring to Collins who ordered the same to be washed by Jackson; upon being washed and returned to Collins, Collins reported to Sims that it was a diamond ring but full of "bubbles"; that Collins also made the same statement to Roumain, who, in accordance therewith stated to Sims that the ring was only worth $130, and that was all he, Roumain, would pay for it if Sims would want to sell it. That then Roumain left the store.
We are convinced by the testimony that when Roumain left his establishment, he left for the sole purpose of obtaining funds with which to purchase this ring rather than for the purpose of reporting the transaction to the police department of Baton Rouge as testified to by him. Being unable to do so, he returned to his store and gave up his own idea and plan of buying this $1,250 ring for the insignificant sum of $130. It cannot be said but that Roumain was acting in a fiduciary way toward Sims and the question arises as to whether or not Griffing, an employee of Roumain, then being present in the store at the time all of this transpired, can be connected with this fiduciary or as a quasi-fiduciary relationship.
It is beyond our understanding how Griffing could not see and know anything of Sims' presence in the store on that Monday morning or of his mission there, and that he, Griffing, did not hear any of the conversation that Sims had with Jackson, Collins and Roumain relative to the ring. All of the evidence is to the effect that when Sims was escorted in this establishment by Jackson, a co-employee of Griffing, that Griffing was in the front part of the store, with Collins in the rear. The unusual circumstances, as disclosed by the record, of this negro coming to the jewelry store to have appraised a ring of great value, on which the test of cutting glass had been previously applied by an employee of that jewelry store under instructions of another employee, should have aroused the curiosity of all those employed in the store. Sims placed plaintiff at a distance of four to fourteen feet away; so does Collins; Roumain, his employer, placed plaintiff Griffing four feet away when all of the conversation relative to the kind, character and value of the ring took place. Another significant fact which leads us in our opinion that Griffing had full knowledge of all facts in the case is that plaintiff, by his own testimony, admits that, using the *Page 449 
vernacular, he purchased this ring "sight unseen". It does not seem reasonable to us that a man with the knowledge plaintiff admits to have relative to fine stones would agree to purchase such a ring and seek to borrow the money to pay for the same under the circumstances as he describes them. He would also lead us to believe that he knew nothing at all about that which took place prior to and in Roumain's store relative to this ring and was not interested in the ring prior to Roumain being unable to purchase the ring; yet, in accordance with his wife's testimony, he met her at Stroube's Drug Store, in the City of Baton Rouge, while she and one of her friends were having "a coke one morning" and informed her about the ring and his desire to buy it. Suffice it to say that his testimony, to say nothing of his pleadings, wherein in his original petition he sets out the fact that he purchased the ring for $121, and paid for it in cash and full discharge and acquittance granted whilst in his answer he states the consideration to be the sum of $130 of which he paid $120, the balance thereof to be paid within a few days from the date of sale, is so contradictory, that, together with his actions, they do not impress us as those of a man who was totally disinterested and not connected with any fraudulent scheme of his employer and or co-employees, and who was simply buying a ring of this value for the insignificant sum of $130.
The testimony of Roumain, Collins and Jackson does not ring with the true facts in the case. Roumain would have the court believe that Sims offered the ring to him for $130; that he knew the value to be over $1,000, but would not have purchased the same for any price; that when he left his store, he left for the purpose of visiting police headquarters but was shadowed by Sims and one of his friends. Collins disavows having informed Griffing of anything relative to the ring, and disavows being present or within hearing of any conversation between Roumain and Sims or Griffing and Sims, and only heard Sims inquire of Griffing about a watch and something said about $130. Jackson admits having requested Sims to bring the ring to Roumain's establishment to be tested by Mr. Roumain, and having informed Collins of Sims' possession of the ring, and the experiment to be had. He admits that he took Sims to Collins that morning, and washed the ring and handed it back to Collins; thereafter he seems to have become blind and deaf as to Sims' and Collins' actions and conversations with Griffing.
The ground on which Sims, the intervenor, seeks to set aside the sale is of course one arising out of the Articles of our Civil Code relating to error and fraud. Under Art.1819, there are four defects of consent which will invalidate any contract entered into by the parties, viz.: "Error; Fraud; Violence; Threats." We are concerned with the first two, but in reality this case involves the second thereof for the reason that Art.1832 provides that: "In all cases, however, when the information, which would have destroyed the error, has been withheld by the other party to the contract, it comes under the head of fraud, and invalidates the contract." The article relative to the nullity of contracts from fraud is Art.1847. The preliminary statement of that article is the most important as it defines fraud, as it applies to contracts, as "the cause of an error bearing on a material part of the contract, created orcontinued by artifice, with design to obtain some unjustadvantages to the one party, or to cause an inconvenience or lossto the other" (italics scoring ours). From this definition, the article then lays down twelve certain rules which it says are drawn therefrom. In rule 4, we find particular reference to false assertions constituting an artifice regarding objects that require particular skill or habit, or any difficult or inconvenient operation to discover the truth or falsity of the assertion; examples are given therein but they are not exclusive. Rule 5 provides that fraud arises from some false assertions made as to the value or quality of the object forming the subject of the contract or by the suppression of what is true regarding the same. Rule 6 provides that: "The assertion and suppression, mentioned in the last preceding rule, mean not only an affirmation or negation by words either written or spoken, but any other means calculated to produce a belief of what is false, or an ignorance or disbelief of what is true." These rules contemplate that in a contract of sale of the very nature of the one with which we are now concerned that where the parties are on an unequal footing, and not dealing at arms length, the one possessing the superior knowledge regarding the value or the quality of the object is held to the exercise of the greatest care and caution in conducting himself and must not take undue advantage of the other party, who, as it happens in this case, is one totally ignorant of the value or *Page 450 
quality of the object and who was attempting to obtain information relative thereto.
In this case, Sims went to Roumain's store upon the solicitation of one of the employees where he had the right to expect a full and complete disclosure of the facts and of the truth regarding the ring. He did not know Roumain, Collins or Griffing. He went there for technical advice as to the character and value of the ring. All of these, in our opinion, were in a fiduciary or quasi-fiduciary relationship towards him, and Sims had a right to expect, in fair dealing, the true information which he had been invited to seek there; and no one, especially under the circumstances as we view them, where all of them had the knowledge of the ring's true character and value, should have taken advantage of him and attempted to buy the ring at a price which was so much out of proportion to its true value.
It must be borne in mind that Sims' purpose in calling at the Roumain Jewelry Store was not to sell the ring but to have it "tested". It would have been fairer on the part of Roumain and his employees, including plaintiff, if they expected to make an offer for the ring, to have allowed Sims to make his own investigation and to have the ring tested by a jeweler of his own choice who would not have been motivated by any desire to purchase the ring at a profit. The fact that Sims did not make any other effort to find out the real value of the ring does not mitigate against him in that, if such was negligence, negligence is not a defense in an action based on error and fraud. Collins, when he told Sims that the diamond had flaws in it, perhaps did not make a mis-statement in a technical sense because it developed that it has what is referred to as three carbon spots or specks on the top table, but to this negro it very probably meant what these parties had intended it to mean, that is, that the ring was of practically of no more value than that offered him. By disclosing only a part of which you may say to be the truth and suppressing the remainder, and under the circumstances we have outlined regarding Griffing, they led Sims into an error of fact, which, it may be said, comes under the head of fraud. Civil Code, Article 1819, 1832 and 1847, supra.
Considerable stress is laid by counsel for plaintiff on the question of the proof that is generally required to show that fraud exists. Whilst it is true that in Article 1848 of the Civil Code it is provided that fraud, like every other allegation, must be proved by him who alleges it, however, that same article further provides that "it may be proved by simple presumptions, or by legal presumptions as well as by other evidence. The maxim that fraud is not to be presumed, means no more than that it is not to be imputed without legal evidence." Courts have always acknowledged how difficult it is for one to prove fraud by positive and direct testimony, realizing full well that those who indulge in it generally prepare themselves in such a manner as to cover up and leave no traces of their practice behind them. In an early case, Simon-Gregory Co. v. Newman, 50 La.Ann. 338, 23 So. 329 the Court stated that: "While fraud is never to be presumed, courts of justice `recognize the cunning concealment in which it shrouds its devious practices and the difficulty of tracing it by direct proof.'" We can well conceive of such a situation in this case where such practices may well have been indulged in and it becomes next to impossible to put our finger on any particular piece of direct testimony to show actual fraud on the part of Griffing. As a matter of fact his fraud wasn't active but rather of a passive nature in that he failed to disclose the information which he was in justice and in equity bound to disclose to the other party to the contract who was not on an equal footing with him. He suppressed the truth, and therefore the case comes within the rules laid down in our Civil Code.
We are cognizant of our jurisprudence to the effect that an appellate court should not reverse the judgment of the lower court oh questions of facts unless manifestly erroneous, but in this cage we are of the opinion that the lower court manifestly erred in his findings of fact as well as the law applicable thereto and that the judgment rendered should be reversed and judgment rendered in intervenor's favor.
For these reasons assigned, it is ordered that the judgment appealed be annulled, reversed and set aside, and accordingly judgment is rendered in favor of intervenor Sims, and against plaintiff Earl Griffing and defendant Wilbur D. Atkins, Chief of Police of the City of Baton Rouge: (a) Dismissing Griffing's suit. (b) Annulling and setting aside the purported sale of a certain diamond ring described as follows: "One three-karat commercial spread with white stone. About three carbon spots or specks under top table. Two blue triangular sapphires on each side, surrounded by three *Page 451 
small diamonds and two small diamonds on the remaining two sides. Platinum mounting. Size 6." (c) Recognizing intervenor Sims as the true and lawful owner thereof, and entitled as such, to the possession of the same. (d) Ordering the Clerk of the District Court for the Parish of East Baton Rouge, in whose custody the ring is, to deliver possession of the same to intervenor upon his depositing with the said Clerk the sum of $121, for the use and benefit of plaintiff Griffing.
It is further ordered that plaintiff Earl Griffing pay all costs.