|,MAX N. TOBIAS, JR., Judge.
The plaintiff/appellant, Chris Trayanoff (“Trayanoff’), appeals the judgment of the trial court in favor of the defendants, Donald A. Pellissier (“Pellissier”), Robert J. Laporte (“Laporte”), Donna Maitre (“Mai-tre”), and the corporation of which they were officers, Oak Island Land Co., Inc. (“Oak Island”). Trayanoff alleged that the defendants defrauded him in a land investment scheme.[1]
Trayanoff and Pellissier met in 1974, when Trayanoff began providing coffee service to Pellissier’s radiator shops. Trayanoff was, at that time, a route salesman of chips, coffee, and snack foods. In or about 1982, Trayanoff formed his own business, Continental Coffee Co., providing coffee service to local businesses. While delivering coffee to one of four radiator shops owned by Pellissier, the two became friends. Both Trayanoff and Pellissier described their 1 pfriendship as close. They frequently socialized and even attended a spiritual retreat together following Traya-noff s divorce.
Trayanoff described Pellissier as a mentor. He testified that he believed Pellissier to be an experienced businessman with extensive knowledge of the real estate market. He knew that Pellissier had a real estate license and had developed other properties in New Orleans. Further, Pel-lissier was involved with the New Orleans East Economic Development Foundation (“NOEEDF”), having at times served on the Board of Directors and as president and vice-president. Trayanoff s opinion of Pellissier was further bolstered when Trayanoff and Pellissier invested in the construction of a townhouse in New Orleans East in 1980. Trayanoff contributed $12,000.00 to the deal and invested sweat equity by painting and preparing the property for occupation. In 1982, when he had the opportunity to own his own business, Trayanoff asked Pellissier for his original investment and the $12,000.00 was returned to him.
In 1984, Pellissier and a partner, Sam Scandaliato (“Scandaliato”), acquired a parcel of land in New Orleans East (“Mi-choud property”) for $417,000.00 in the hopes that economic development in New Orleans East would increase the value of the property. Pellissier and Scandaliato borrowed $80,000.00 from the Hibernia National Bank to make the down payment and arranged for the owner of the property to owner-finance the balance of $337,000.00. Subsequently, they obtained a personal loan from the Whitney National Bank (“the Whitney”) to make payments to the owner on the balance owed on the property. As of 30 June 1988, |3the debt incurred by Pellissier and Scandaliato totaled $450,000.00 and Pellissier then borrowed money from First Eastern Bank & Trust Company to pay off the previous owner and to pay on the Whitney loan. By early 1990, the debt was $500,000.00 and Pellissier and Scandaliato still owed the Whitney $117,000.00. Scandaliato, according to his own testimony, was forced to bankrupt his business, told Trayanoff that he could no longer support the debt on the Michoud property, and disavowed any further responsibility for the note at the Whitney. Interestingly, he admitted that no steps were taken to remove his name from the note. Thus, in 1990, Pellis-sier was facing a partner about to declare bankruptcy and the FDIC was attempting to foreclose on the property.
*352 In 1990, Trayanoff found Pellissier very upset in his office. Pellissier told Traya-noff that his business partner was filing bankruptcy and that he could no longer pay the mortgage on the Michoud property himself. He was concerned that the bank would foreclose on him and take deficiency judgments. Trayanoff testified that he offered to borrow money on his credit cards to help Pellissier manage his debts and keep the FDIC from foreclosing.[2] He gave Pellissier a cashier’s check for $1,700.00 on 10 August 1990; a check in blank for $2,639.97 on 15 November 1990; and several personal checks made payable to Pellissier on 20 February, 25 April, 30 July, and 4 November 1991, totaling $5,806.71. Thus, as of 4 November 1991, Trayanoff had turned over to Pellissier over $10,000.00.
|Jn exchange for the money, Pellissier purportedly offered Trayanoff an opportunity to invest in the Michoud property. Trayanoff testified that Pellissier told him that the property was worth close to $1,000,000.00 and that they should have no trouble selling it within 18 months. He showed Trayanoff two appraisals for the Michoud property dated 1984 and 1988, both of which valued the land at $877,000.00. Although the land was undeveloped, Pellissier told Trayanoff that it would be a great site for a new tourist center and even produced a letter from Dale Tynes, an officer of the NOEEDF, which stated that the Michoud property was the best site for the tourist center and the price for the property was expected to be $3.50 per square foot.
Trayanoff testified that he could not afford to participate in the land deal, but Pellissier persuaded him by agreeing to repay all of Trayanoff s money on demand if he needed it, as he had in their prior business venture. According to Trayanoff, Pellissier told him that he would enjoy a return on his money shortly. Trayanoff testified that he agreed to treat the loans as an investment, and testified that had Pellissier not agreed to return his money should he need it, he would not have invested in the property.
Pellissier introduced Trayanoff to La-porte, a certified public accountant, and told Trayanoff that he wanted to bring him in as a co-investor. Trayanoff, Laporte, and Pellissier had a meeting to discuss the Michoud property. Notes taken by Traya-noff purportedly show that at that meeting, Pellissier was valuing the Michoud property at $5.00 per square foot, or $1,400,000.00. Trayanoff testified that at that time he wasn’t interested in investing in the land, but rather in helping his friend out by loaning him money so that he could keep the Michoud property. He testified that Pellissier and Laporte wanted to form a corporation to develop the [¡¡property, and that he didn’t understand the need to incorporate. He further testified that he was never present at an election of any directors or officers, and didn’t even realize that he had been “elected” president of the company.
Laporte testified that he incorporated the company to protect the three from personal liability, and that the incorporation was not meant to divest Trayanoff of his rights in the property. Laporte, Pellissier, and Trayanoff were supposed to own the land equally, each having 1/3 interest in the property. At the outset of *353 incorporation, Laporte, Pellissier, and Trayanoff were each issued 100 shares of Oak Island stock.
According to Trayanoff, it was also at that meeting that Laporte and Pellissier told him that if Oak Island purchased the property from Pellissier and his wife, the property would be dationed and the FDIC would not foreclose on the land. The company would offer $75,000.00 for the property and Pellissier asked Trayanoff to request that Pellissier be completely released from his debt on the property as a condition of the sale. A letter to that effect was signed by Trayanoff as president of Oak Island and was sent to the FDIC. The letter did not mention Pellissier’s involvement in Oak Island.
William Curry (“Curry”), an attorney retained by Pellissier to incorporate Oak Island, handled the Act of Sale of the Michoud property. At the Act of Sale, Pellissier and Laporte produced a counter letter regarding the sale of the property. Pellissier and Laporte put a provision in the counter letter that the sale price of the land was not only the $75,000.00 paid to the FDIC, but that Oak Island was to assume an obligation to pay a loan to Whitney National Bank in the amount of $117,000.00, pay Pellissier $50,000.00 ostensibly to satisfy any deficiency due to the FDIC arising out of the mortgage on the land, and to cover four years of back | fitaxes. Trayanoff testified that he had questions about signing the counter letter, but that he was persuaded by Pellissier and Laporte to sign it.
The proposed tourist center was not located on the Michoud property and the land was never sold. Trayanoff reportedly asked Pellissier to list the property for sale because he had gone heavily into debt over the deal, but Pellissier did not think the market was good enough.[3] Trayanoff continued to make payments to the corporation to pay taxes and for “cash calls,” and from 10 August 1990 to 30 January 1998, Trayanoff paid a total of $84,629.30 into the corporation.[4] In early 1998, Tray-anoff became suspicious and stopped making payments. He retained counsel and filed this suit.
Maitre testified regarding her role in the corporation as secretary. She confirmed that she had been employed by Laporte for over thirty years as a secretary and office manager. She testified that Laporte had asked her to act as secretary of the corporation “for clerical purposes,” which she interpreted to mean that she would perform whatever secretarial tasks were needed (primarily typing and clerical duties) and not that she would have a duty to sign documents or to fulfill the role of a corporate officer. She never attended any shareholder meetings or meetings of the Board of Directors; as a result, she never kept any minutes of any meetings regarding the corporation. In fact, Maitre testified that the only time she was in the same room with the three initial shareholders (Pellissier, Laporte, and Trayanoff) was for the initial meeting. Laporte reportedly kept the minutes of the meetings himself, and asked Maitre to type them up afterwards. This she would do and sign as secretary of the corporation.
LMaitre was shown a number of corporate documents bearing her signature, and she confirmed that she had signed them at the direction of Laporte. With regard to documents signed by Trayanoff and her, in particular the “Deposit Account Contract, Authorization of Corporation to Open De *354 posit Accounts,” she could not confirm that she had signed the documents in Traya-noff s presence. Further, the “Minutes of a Special Meeting of the Special Directors of Oak Island Land Co., Inc.” state that Maitre and Trayanoff were present, and that Maitre kept the minutes of the meeting. However, Maitre testified that she neither attended the meeting nor prepared the minutes, but rather that she signed the minutes when asked to do so by Laporte. She further testified that she became a shareholder in the corporation in 1998 when Laporte gave her money to buy sixty shares from him.
Curry also testified. He stated that he was retained by Pellissier to act as legal counsel for Oak Island. He handled the paperwork to form the corporation, purchase the property on behalf of the corporation, and in creating a collateral mortgage for the property for $400,000.00. Curry testified that he was named the initial director of Oak Island, and that this was standard practice in his experience in setting up corporations. His normal practice would be to resign as director shortly thereafter. He could not explain why he had not resigned as a director for a number of years after the incorporation of Oak Island; he chalked it up to an oversight. Curry further testified that he was not retained to handle the daily business activities of Oak Island and that he did not get involved in business decisions of the company, other than to explain the paperwork he had drafted for Trayanoff, Pellissier, and Laporte to sign. His function was primarily that of a notary public. He explained that he had no financial stake in the company. He|stestified that it was his practice to explain to each individual asked to sign a document at an Act of Sale or any other legal proceeding what the document was and what it meant.
Trayanoff asserts that the entire plan to get him involved in Oak Island and to sign the paperwork setting up the corporation as president was a scheme for Pellissier to retain the Michoud property without the FDIC realizing that he had, with partners, essentially purchased the property from himself, escaping any deficiency judgments. In support of this assertion, Tray-anoff notes that he never attended a shareholder meeting and that the stock issued to Pellissier was “held” by Laporte at the outset to keep Pellissier’s name off any paperwork that might cause him problems with the FDIC. Further, after Trayanoff stopped making payments to the corporation, Laporte and Pellissier issued themselves additional stock, diluting Trayanoff s investment in the company. Trayanoff further notes that the tax returns for Oak Island for 1992, 1993, 1994, and 1995 report Laporte as the owner of the shares actually issued to Pellissier, not that he was “holding” them. Both Laporte and Pellissier admitted that they did not pay cash for the later shares issued to them, but rather that they forgave debt of the corporation in exchange for more shares.
Leon Jacques Gibert, Jr. (“Gibert”) testified on behalf of the appellees as an expert in real estate appraisal. Gibert testified that, having completed an analysis of the relevant market conditions, potential commercial use of the parcel, and neighboring properties, the parcel in question would have had a fair market value of approximately $1.75 per square foot as of March 1988, or $475,000.00. He described the collapse of the real estate market in New Orleans East and opined that as of December 1996, the property would have had a fair market value of [9$1.70 per square foot, or $459,000.00. He confirmed the property’s decline in value and testified that as of November 2001, the property had a fair market value of $1.41 per square foot, or $382,714.28. He opined *355 that given the characteristics of the property, “most retail and business uses would not be financially feasible” because there are not enough shopping dollars in the immediate area to support a retail venture and because the property lacks access to water and sewerage services. Further, although the property is located near the interstate highway, no signage would be visible from the interstate to draw business. He concluded by testifying that at the end of 2001 “the highest and best use [of the property] is still speculation.”
Following a bench trial, the court issued a judgment in favor of the defendants. The reasons for judgment state:
The Court finds that the plaintiff has failed to sustain his burden of proving fraud, misrepresentation, or breach of fiduciary duties. The Court further finds that while the corporate formalities may not have been strictly followed in all circumstances, the officers and directors acted in good faith in managing the corporation.
Judgment will be rendered accordingly.
Trayanoff assigns three errors to the trial court. First, Trayanoff argues that the trial court erred in failing to consider that Pellissier occupied a position of confidence with Trayanoff such that the standard for fraud and misrepresentation was different than if the two had been equals. Second, Trayanoff argues that the court erred in failing to address the terms of the oral contract among Pellissier, Trayanoff, and Laporte, or alternatively, in failing to interpret the terms of the oral contract. Finally, Trayanoff asserts that the trial court erred in allowing interested | ^directors to dilute the value of the stock and to pay $50,000.00 to Pellissier that was due before the sale of the property.

Assignment of Error No. 1:

Trayanoff argues that the trial court did not consider the relative positions of Trayanoff and Pellissier within their relationship in evaluating the cause of action sounding in fraud. Further, Trayanoff asserts that the trial court’s failure to state the standard to which Pellissier should be held means that the reviewing court’s analysis is not limited to a manifest error/clearly wrong standard. We disagree.
Trayanoff relies on Kelly v. Messina, 318 So.2d 74 (La.App. 4th Cir.1975) in support of his argument that this court should perform a de novo review of this matter. In Kelly, this court found:
On considering the trial court’s reasons for judgment, we find no indication as to how this conflict in the testimony was resolved. The trial judge only summarized the testimony of each witness who testified and concluded that the boy was contributorily negligent without a finding as to the negligence of the driver or any call as to the credibility of the witnesses. Therefore, our task in examining this record is not simply to determine whether there is manifest error in the trial judge’s findings. Nor do we have the advantage of any credibility calls which he could have made.
Kelly, 318 So.2d at 76. In the present case, we are dealing with brief reasons for judgment. However, the reasons for judgment make clear that the trial court did not believe that Pellissier or Laporte acted in bad faith and that Trayanoff s evidence did not preponderate to satisfy his burden of proof regarding the claims of fraud, misrepresentation, or breach of fiduciary duty. That is tantamount to a finding that the defendants’ testimony was more credible than that of Trayanoff. The judgment as rendered is brief and without specific findings of fact that would make comprehension of the trial court’s credibility determinations and ruminations ^regarding *356 the case easier to discern, but the judgment as rendered does not compel us to perform a de novo review.
Trayanoff next takes issue with what he perceives as the trial court’s failure to consider the relative positions of Trayanoff and Pellissier in analyzing the fraud allegations. It is clear that Traya-noff admired Pellissier and that he trusted him as a businessman and friend. Further, Trayanoff clearly knew that Pellissier had real estate holdings, held a license in real estate, and was very familiar with New Orleans East through his work with the NOEEDF. However, it is also true that Trayanoff owned his own business. He formed a corporation and operated his coffee service through the same vehicle (corporation) that was allegedly used to defraud him in the instant matter. Further, he acted as president of the corporation for some time and signed documents regarding the incorporation and operation of Oak Island. Pellissier notes that he and Trayanoff are around the same age, both are businessmen in the New Orleans area, and both have similar educational backgrounds.
Trayanoff looks to two cases to support his claim that he was intentionally misled by a more sophisticated party. In Griffing v. Atkins, 1 So.2d 445 (La.App. 1 Cir.1941), an uneducated man was persuaded to bring a ring he had found to a jeweler for an appraisal by a friend who worked at the store. The jeweler told him that the ring was flawed and that he would give him $130.00 for it, when in actuality, the ring was worth $1,250.00. The court held that the jeweler had a quasi-fiduciary duty to the man to give him an honest valuation and rescinded the sale. The facts of this case, however, are not applicable to this case. In Griffing, the object of the transaction was a ring was a certain value, rather than investment in undeveloped land. Although it is clear that the jeweler lied, it is not clear that |1gthe same deception occurred in the case at bar. The investment opportunity seems to be a bad one in hindsight, but we are mindful that in the mid-1980s, there were, according to Trayanoff s own appellate brief, 21 planned residential projects with 6,500 residences in New Orleans East, including a planned U.S. Homes subdivision, that could have supported a commercial use for the Mi-choud property. Albert Eason, the individual who prepared the 1984 and 1988 $877,000.00 appraisals on the property, testified at trial that at the time, the property had a high estimated value due to the expected residential market in that area. Although Trayanoff asserts very strenuously that Pellissier knew that the Mi-choud property was not worth nearly what the appraisal stated, Pellissier asserts that he was up front about the property and disclosed everything he knew about it when he met with Trayanoff and Laporte. The trial court apparently lent more credence to Pellissier’s testimony than to Trayanoff. In this regard, the trial court’s conclusion is neither manifestly erroneous nor clearly wrong.
Trayanoff also cites Johnson v. First Nat. Bank of Shreveport, 2000-870 (La.App. 3 Cir. 6/20/01), 792 So.2d 33, in support of his assertion that Pellissier used his superior knowledge and position to defraud him. In Johnson, a bank officer of First National Bank of Shreveport developed close personal relationships with his clients, representing to them that the bank required that they follow his advice if they were to remain customers of the bank. He also apparently directed his clients to make decisions regarding their businesses (primarily livestock) for his own gain and encouraged them to borrow more money from the bank to cover past losses when those decisions did not bear out to be financially sound. The court noted that it *357 became clear that his clients believed that failing to follow the bank officer’s wishes could have drastic negative consequences on their credit.
|13Trayanoff likens Pellissier to the bank officer. However, Johnson is immediately distinguishable from the present matter. The suit in Johnson was brought after the wrongdoing of the bank officer was exposed and after he had confessed to his misdeeds. Therefore, the issue of proof that is readily apparent in this matter was not at the forefront of the Johnson case. The wrongdoing had already been conceded and the facts regarding that wrongdoing were not in dispute. In the case at bar, the alleged wrongdoing rests on a contest of credibility between Trayanoff and the defendants, as well as supposition and inference drawn from the documented facts. The trial court in this matter did not have a confession of wrongdoing as a backdrop for its judgment, and clearly did not believe that the evidence presented preponderated to support Trayanoff s allegations.
We are mindful that La. C.C. art. 1949 provides that:
Error vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party.
La. C.C. art. 1950 provides:
Error may concern a cause when it bears on the nature of the contract, or the thing that is the contractual object or a substantial quality of that thing, or the person or the qualities of the other party, or the law, or any other circumstance that the parties regarded, as a cause of the obligation.
In the matter sub judice, Trayanoff is clearly arguing that his misapprehension of the value of the land and his rights and obligations once Oak Island was formed should serve to rescind the contract he entered into with Pellissier and Laporte, especially if, as he contends, Pellissier and/or Laporte intentionally misled him. However, Trayanoff was required to prove the error by a preponderance of the evidence. Although the circumstances surrounding the investment agreement 114between Pellissier, Laporte, and Traya-noff seem suspicious, and although the corporation was managed in a less-than-perfect manner, we cannot find that the trial court erred in failing to reach the conclusion that Trayanoff was defrauded or manipulated through his relationship with Pellissier. The trial court was neither manifestly erroneous nor clearly wrong in this regard.

Assignment of Error No. 2:

Trayanoff further asserts that the trial court erred in failing to interpret the terms of the oral contract between him, Pellissier, and Laporte. Trayanoff testified that when he, Pellissier, and Laporte agreed that he would invest in the Mi-choud property, he was promised that he would be able to recover the money he had already paid Pellissier at any time. Subsequent to this agreement, Laporte and Pellissier decided to incorporate Oak Island, ostensibly because Laporte was uncomfortable with the loose nature of the arrangement. Trayanoff argues that the incorporation should not operate to divest him of his right to get his money back.
The defendants argue that although an oral agreement existed between the three, no agreement was reached that Trayanoff would be entitled to a refund on demand. Further, in light of the incorporation of Oak Island, any agreement to that effect would essentially be vitiated in part by the formation of the corporation, supplanted by state and federal laws regulating securities exchange.
*358 It is uncontested that Pellissier, La-porte, and Trayanoff had an oral agreement to acquire the land and sell it for profit. The only issue in contention regarding this agreement is what rights or recourse Trayanoff was to enjoy in this deal. The appellees assert that it is simply incredible that any businessman could expect to invest money in a land deal and then just walk away with his entire investment if things were not going the way he had envisioned. We agree that this h 4s an unrealistic expectation. However, we are reminded that these were the terms of a prior deal between Pellissier and Traya-noff involving real estate when Trayanoff s entire investment was returned upon demand; however, Laporte was not a party to the earlier deal. Therefore, while Tray-anoff might have been unrealistic in his expectations in the Michoud property deal, his history with Pellissier may well have led him to believe that such a deal was possible, even desirable for Pellissier.
Whether such a provision existed in the oral agreement essentially is a credibility call by the fact-finder. Pellissier and Laporte deny that Trayanoff was ever entitled to a refund of his money on demand for indeed, it would be impracticable or impossible once the money was tied up in Oak Island which in turn existed to hold title to the land to easily make a cash disbursement. Thus, while it is impossible to determine exactly to what extent the trial court considered the terms of the oral contract given the brevity of the trial court’s reasons for judgment, we assume and conclude that the trial court lent more credence to Pellissier’s and Laporte’s version of events than to Trayanoffs. As credibility determinations are the province of the fact-finder at trial, we may not disturb such a finding, even if we might have found differently if we sat as the fact-finder. Stobart v. State, Through Dept. of Transp. and Dev., 617 So.2d 880, 882 (La.1993). The Supreme Court of Louisiana has articulated a two-part test a reviewing court should use when contemplating overturning a trial court’s findings of fact. Henderson v. Nissan Motor Corp., 2003-606 (La.2/6/04), 869 So.2d 62, citing, Mart v. Hill, 505 So.2d 1120 (La.1987). In order to correctly overturn a trial court’s findings of fact, an appellate court must first “find from the record that a reasonable factual basis does not exist for the finding of the trial |1ficourt” and then must “further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).” Id. at 68, citing, Mart v. Hill, 505 So.2d at 1127. In the present case, we find that a reasonable factual basis exists to support the judgment of the trial court. Further, we do not find that the record establishes that the judgment is clearly wrong.

Assignment of Error No. 3:

Finally, Trayanoff argues that the trial court erred in allowing Laporte and Pellissier to issue themselves additional shares of stock, effectively diluting Traya-noffs shares, and in paying Pellissier $50,000.00 before the sale of the property. Trayanoff asserts that these actions are violations of Pellissier’s and Laporte’s duties as fiduciaries of the corporation. Further, Trayanoff argues that the transfer of shares should be voided because the shares of stock were issued in consideration for forgiveness of past loans to the corporation by Pellissier and Laporte, which is contrary to Louisiana law.
La. R.S. 12:52(C) provides that:
The consideration for shares issued otherwise than as stated in subsection B of this section, shall be paid in cash or in corporeal or incorporeal property, or services actually rendered to the corporation, the fair value of which is not less *359 than the dollar amount of the consideration fixed for the shares, before the shares are issued. Upon payment of the consideration fixed therefore, such shares shall be considered fully paid. Cash consideration for shares may not be paid by the purchaser’s note, secured or unsecured, or uncertified check; and in case of delivery of such a note or check in payment for shares, the shares shall not be issued until the note or check has been paid in full. [Emphasis added.]
Trayanoff argues that the shares in question were issued immediately, and not held by the corporation until the $50,000.00 was allegedly paid, as is maintained by 117PelIissier and Laporte. The tax returns for 1998 filed on behalf of Oak Island reflect that the additional shares were issued to Pellissier and Laporte before the end of 1998. Trayanoff urges that this distribution of stock was designed to dilute his shares in Oak Island. However, the record reflects that Trayanoff was contacted by Oak Island with an offer to buy more shares before Pellissier and Laporte purchased their shares and that he did not respond. Oak Island exhibits also show that Trayanoff was advised by correspondence of the proposed issuance of stock as well as the issuance of stock in 1998. Pel-lissier and Laporte essentially testified that they were merely capitalizing the debt of the corporation.[5]
Trayanoff argues that as fiduciaries of the corporation (Pellissier and Laporte were directors at this time), they had a duty to protect his rights zealously and to not take advantage of their positions as directors. See, Noe v. Roussel, 310 So.2d 806, 818 (La.1975) and Plaquemines Parish Commission Council v. Delta Development Co., 502 So.2d 1034, 1040 (La.1987). Pellissier and Laporte note that the trial court found that they acted in good faith with respect to their roles as fiduciaries to the corporation, as reflected in the reasons for judgment. Further, the issuance of stock to themselves was not a breach of any fiduciary duty because Trayanoff was afforded the same opportunity to acquire additional stock and simply opted not to do so by refusing to respond to the notices from Oak Island. Given the facts of this case, we do not find that the trial court erred in failing to find that the defendants breached a fiduciary duty to Trayanoff.
[ 1sFor the foregoing reasons, we find that the trial court was neither manifestly erroneous nor clearly wrong in rendering its judgment for the defendants. Accordingly, we affirm the judgment.

AFFIRMED.

. Although the petition in this matter was originally styled as a "Verified Petition for Appointment of Receiver of Louisiana Corporation for Injunctive Relief and for Damages,” Trayanoff later dismissed the motion to appoint a receiver, while maintaining his action for damages.

. Although Trayanoff claims to have used credit cards to raise the money to give to Pellissier, we note that no credit card records or statements were presented at trial or made part of the record. Because the amount of money supplied by Trayanoff to Pellissier and/or Oak Island is not in dispute, the lack of documentation of this point is of no moment.

. The record does not reflect that the Mi-choud property has ever been listed for sale.

. This figure includes the amounts paid to Pellissier.

. In Riggins v. Dixie Shoring Company, Inc., 590 So.2d 1164 (La.1991), the Louisiana Supreme Court held that the corporate veil would not be pierced to hold a majority stockholder liable for wrongdoing absent evidence that he used the corporate form to perpetrate a fraud. Insofar as we find that the trial court was not manifestly erroneous nor clearly wrong in its finding that there was insufficient evidence to sustain Trayanoff's claims of fraud, we similarly decline to disregard the corporate form.